STATE OF NORTH CAROLINA v. MICHAEL ALLEN STAFFORD

No. 848SC1098

(Filed 1 October 1985)

**Criminal Law § 53; Rape and Allied Offenses § 4— medical testimony—victim's symptoms of rape trauma syndrome inadmissible hearsay**

Testimony by a pediatrician concerning symptoms of rape trauma syndrome an alleged rape victim told him she had was not admissible under G.S. 8C-1, Rule 803 but was inadmissible hearsay where his examination of the victim was conducted in preparation for trial and not for purposes of diagnosis and treatment. Furthermore, the pediatrician's testimony was not admissible to corroborate the victim because it went far beyond the victim's testimony.

Judge BECTON concurring in result.

Judge MARTIN dissenting.

APPEAL by defendant from *Lewis, Judge.* Judgment entered 18 July 1984 in Superior Court, WAYNE County. Heard in the Court of Appeals 20 August 1985.

The defendant was tried for second degree rape and taking indecent liberties with a minor. Tammy Ingram, a 14 year old girl, testified that on 9 December 1983 she spent the night in the home of her aunt, Sally Stafford, and her uncle, Michael Stafford. She testified further that she awoke after the defendant entered her room at which time he raped her. She did not tell anyone of the incident until 11 January 1984. On that day she told a friend who insisted that Tammy Ingram tell her mother. On 12 January

1984 Tammy Ingram's mother took her to the office of Dr. Joseph Ponzi. She did not see Dr. Ponzi again until Friday, 13 July 1984, when she returned to his office. The trial of this case commenced on 16 July 1985. She testified that in December 1983 she weighed 125 pounds and weighed between 110 and 115 pounds at the time of the trial. She also testified that her grades in school went down after she had been raped.

Dr. Joseph Ponzi, a pediatrician, testified that on 12 January 1984 Tammy Ingram and her mother came to his office. He examined Tammy Ingram on that date and saw her again on 13 July 1984. The defendant objected to testimony by Dr. Ponzi as to a rape trauma syndrome and the court conducted a voir dire hearing out of the presence of the jury. Dr. Ponzi testified at the voir dire hearing that a rape trauma syndrome is a condition with a well recognized complex number of symptoms. There have been several articles on it which have been published in medical journals. He said he could not form an opinion as to whether Tammy Ingram had a rape trauma syndrome but he could state what the symptoms are and what are the symptoms he found in Tammy Ingram. Dr. Ponzi then testified before the jury that a rape trauma syndrome is a list of symptoms or a symptom complex that is attributable to people who have been raped. He said, "It shows such things as musculoskeletal complaints, headaches, vomiting, weight loss, vaginitis, dysmenorrhea, emotional turmoil. These kids often, or adolescents are often depressed, very emotional, labile; other things, they feel guilty, anxious, self depreciating themselves." He testified that on 13 July 1984 Tammy Ingram told him she had a 15 pound weight loss between December and February, that she had been vomiting, that she cried a great deal, was emotionally labile, had a decreased school performance, had nightmares and dreamed about the incident.

The defendant testified that he had not had sexual relations with Tammy Ingram at any time. His wife testified that she slept in the same bed as the defendant on the night of 9 December 1983 and that she heard no commotion that night. She also testified that Tammy behaved normally the next morning. The defendant introduced evidence of his good character and reputation.

The defendant was convicted of second degree rape and was sentenced to twelve years in prison. He appealed.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Alfred N. Salley, for the State.*

*Barnes, Braswell & Haithcock, by R. Gene Braswell and S. Reed Warren, for defendant appellant.*

WEBB, Judge.

The appellant's only assignment of error is in regard to Dr. Ponzi's testimony in regard to the rape trauma syndrome. We believe this assignment of error has merit. Dr. Ponzi testified as to the symptoms of rape trauma syndrome. He then testified as to the symptoms Tammy Ingram told him on 13 July 1984 that she had. If this testimony was introduced to prove the symptoms which Tammy Ingram had so that the jury could then determine whether she had a rape trauma syndrome it was hearsay testimony. It was offered to prove the truth of what Tammy Ingram told Dr. Ponzi. *See* G.S. § 8C-1, Rule 801(c) for a definition of hearsay. We do not believe this testimony was admissible under any exception to the hearsay rule. G.S. § 8C-1, Rule 803 provides in part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (4) Statements for Purposes of Medical Diagnosis or Treatment — Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

We do not believe this exception is applicable in this case. It is obvious that Tammy Ingram went to Dr. Ponzi on 13 July 1984 in preparation for going to court. She did not go for treatment. We do not believe we should hold she went for diagnosis. The commentary says this exception to the hearsay rule is based on the strong motivation for truthfulness when a patient is seeking treatment from a physician. For this reason we believe the diagnosis for which the exception to the hearsay applies should be a diagnosis for the purpose of treating a disease.

If the testimony were offered for the purpose of corroborating Tammy Ingram's testimony it would not be hearsay. Nevertheless a good part of it should have been excluded because Dr. Ponzi's testimony did not corroborate Tammy Ingram's testimony. Tammy Ingram testified that between December 1983 and July 1984 her weight went from 125 pounds to between 110 and 115 pounds. She also testified she made lower grades in school. Dr. Ponzi testified that she told him that she had a 15 pound weight loss, that she had been vomiting, that she cried a great deal, was emotionally labile, had a decreased school performance, had nightmares and dreamed about the incident. This testimony went far beyond corroborating the testimony of Tammy Ingram. It was error to admit it. *See State v. Taylor*, 280 N.C. 273, 185 S.E. 2d 677 (1972). We hold this is an error requiring a new trial.

New trial.

Judge BECTON concurs in the result.

Judge MARTIN dissents.

Judge BECTON concurring in the result.

Considering the current social science and medical research on rape trauma syndrome, I conclude that Dr. Ponzi's testimony about rape trauma syndrome was reversibly prejudicial. First, although it may be a therapeutic tool, the rape trauma syndrome has not gained acceptability as a socio-medical scientifically reliable means for proving that a rape occurred. As the Minnesota Supreme Court said in *State v. Saldana*, 324 N.W. 2d 227, 229-30 (1982):

> Rape trauma syndrome is not the type of scientific test that accurately and reliably determines whether a rape has occurred. The characteristic symptoms may follow *any* psychologically traumatic event. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 236 (3d ed. 1980). At best, the syndrome describes only symptoms that occur with some frequency, but makes no pretense of describing every single case. C. Warner, *Rape and Sexual Assault* 145 (1980).

Some suggest that there are as many as fifty symptoms of the rape trauma syndrome today, many of which would be applicable to hijack victims, prisoners of war, kidnap victims, as well as others who have been subjected to psychologically traumatic events. Second, Dr. Ponzi did not testify about the reliability or validity of the rape trauma syndrome evidence in this case. Third, the history and purpose of the rape trauma syndrome concept suggests that it was not designed to prove that a rape in fact occurred. As the California Supreme Court observed in *People v. Bledsoe*, 36 Cal. 3d 236, 249-50, 203 Cal. Rptr. 450, 459, 681 P. 2d 291, 300 (1984):

> Unlike fingerprints, blood tests, lie detector tests, voiceprints or the battered child syndrome, rape trauma syndrome was not devised to determine the "truth" or "accuracy" of a particular event—i.e., whether, in fact, a rape in the legal sense occurred—but rather was developed by professional rape counselors as a therapeutic tool, to help identify, predict and treat emotional problems experienced by the counselors' clients or patients. . . . [R]ape counselors are taught to make a conscious effort to avoid judging the credibility of their clients. . . . "[W]hen a psychologist becomes judgmental, he/she has become entrapped in a major pitfall. . . ."
>
> Thus, as a rule, rape counselors do not probe inconsistencies in their clients' descriptions of the facts of the incident, nor do they conduct independent investigations to determine whether other evidence corroborates or contradicts their clients' renditions.

(quoting Kilpatrick, *Rape Victims: Detection, Assessment and Treatment* (Summer 1983) Clinical Psychologist 92, 94) (citation omitted). Finally and significantly, defendant did not raise "consent" as a defense. Use of the rape trauma syndrome when a defendant contends the victim consented is not as problematical as use of the syndrome when, as in the instant case, the defendant contends he did not engage in sexual intercourse with the victim. That is, when a defendant does not contest the fact that a rape occurred, but merely denies he committed it, rape trauma syndrome evidence may be irrelevant and prejudicial.

Although set in print, these words are not figuratively cast in stone for eternity. When, and if, the methodological flaws in

rape trauma syndrome studies are avoided and the rape trauma syndrome gains general acceptance as a non-prejudicial tool to inform jurors about what course of action they should take, I would not hesitate to re-evaluate the position I take today.

Believing the jury could have been misled by Dr. Ponzi's testimony, even though he offered no opinion, and that the danger of unfair prejudice outweighs any probative value the evidence may have had, I concur in the result.

Judge MARTIN dissenting.

I disagree with the majority's conclusion that Dr. Ponzi's testimony as to Tammy Ingram's symptoms, as related to him by Tammy and her mother, was inadmissible hearsay. I would find that his testimony was admissible as substantive evidence under G.S. 8C-1, Rule 803(4). Rule 803(4) excludes from the hearsay rule: "[s]tatements made for the purposes of medical diagnosis or treatment and describing medical history, or *past or present symptoms*, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." (Emphasis added.) The reason for the admission of such statements is grounded upon their reliability due to the declarant's motivation to assist the physician in diagnosis or treatment. Not only are statements by the patient admissible, but a statement made to a physician by a third person as to the patient's symptoms would also be admissible if made for purposes of diagnosis and treatment of the patient, and if the court determines that the statement is likely to be reliable. 4 J. Weinstein & Berger, Weinstein's Evidence p. 803-(4)[01] at 145 (1985). "In the case of a child, a court would undoubtedly assume the absence of any motive to mislead on the part of his parents." *Id.*

The majority opinion narrowly interprets Rule 803(4) as applying solely to "a diagnosis for the purpose of treating a disease." Such a restrictive interpretation obviously excludes statements reasonably pertinent to diagnosis or treatment of other medical conditions, *e.g.*, broken bones, drug and alcohol addiction and psychological disorders. I would not so restrict the interpretation of the rule, but would instead apply the following test to determine the admissibility of the declarant's out of court

statement: is the declarant motivated to tell the truth because diagnosis or treatment depends on what she says; and is it reasonable for the physician or health care provider to rely on this information in diagnosis or treatment. *See United States v. Iron Shell*, 633 F. 2d 77 (8th Cir. 1980).

The majority also states that it is obvious that Tammy Ingram's visit to Dr. Ponzi on 13 July 1984 was "in preparation for going to court" rather than diagnosis or treatment. I see nothing in the record to indicate that the reason for her visit was solely in preparation for Dr. Ponzi's court testimony rather than for assistance with the symptoms described by Tammy and her mother. The mere fact that both declarants were aware of the pending court proceeding does not render inadmissible their statements to him made for a medical purpose. Dr. Ponzi testified that he attempted to make a medical diagnosis. Both Tammy and her mother responded to questions asked by Dr. Ponzi and their answers provided him with information as to Tammy's physical, emotional and mental well-being; information which could serve as a basis for diagnosis and treatment of her condition. As such, the statements were within the scope of admissible hearsay permitted by Rule 803(4). *See United States v. Iron Thunder*, 714 F. 2d 765 (8th Cir. 1983); *State v. Hebert*, 480 A. 2d 742 (Me. 1984).

The concurring opinion finds error in the admission of Dr. Ponzi's testimony concerning the symptoms comprising "rape trauma syndrome." In my view this testimony was relevant and its admission was not an abuse of the trial court's discretion.

Dr. Ponzi was accepted by the court as an expert witness in the field of pediatric medicine and testified that he had treated many patients, from infants to college age, upon complaints of sexual abuse. He testified that he is familiar with the complex number of symptoms medically recognized as rape trauma syndrome. He testified as to what those symptoms were and also testified as to the symptoms exhibited by Tammy Ingram, as related to him by Tammy and her mother. He did not testify that Tammy's symptoms were produced by rape, or that her disorder resulted from sexual abuse at the hands of defendant. He did not express an opinion that Tammy Ingram suffered from rape trauma syndrome.

Expert testimony regarding the symptoms of an alleged victim's psychological response to rape or sexual assault has been admitted in several jurisdictions, *State v. Middleton*, 294 Or. 427, 657 P. 2d 1215 (1983); *State v. Marks*, 231 Kan. 645, 647 P. 2d 1292 (1982); *People v. Reid*, 123 Misc. 2d 1084, 475 N.Y.S. 2d 741 (1984) and rejected in others, see *State v. Saldana*, 324 N.W. 2d 227 (Minn. 1982); *State v. Allewalt*, 61 Md. App. 503, 487 A. 2d 664 (1985). Admission of such evidence has been advocated by some legal authors, see Massaro, *Experts, Psychology, Credibility and Rape: The Rape Trauma Syndrome Issue and Its Implications for Expert Psychological Testimony*, 69 Minn. L. Rev. 395 (1985) and criticized by others, see Note, *Checking the Allure of Increased Conviction Rates: The Admissibility of Expert Testimony on Rape Trauma Syndrome in Criminal Proceedings*, 70 Va. L. Rev. 1657 (1984). Until now, however, the issue has not been addressed by North Carolina's appellate courts.

I would hold such expert testimony admissible. There is recognized scientific authority for the medical conclusion that there exists a complex and unique number of physical and emotional symptoms exhibited by victims of rape, which are similar, but not identical, to other post-traumatic stress disorder symptoms. Massaro, *supra* (reviewing scientific studies). An understanding of those symptoms, the unique reactions of victims of rape, is not within the common knowledge or experience of most persons called upon to serve as jurors. Therefore, expert testimony as to the symptoms of the syndrome and its existence, is admissible to assist the jurors in understanding the evidence and in drawing appropriate conclusions therefrom. G.S. 8C-1, Rule 702; *State v. Wilkerson*, 295 N.C. 559, 247 S.E. 2d 905 (1978) ("battered child syndrome," expert testimony admissible).

To say that such evidence is irrelevant misinterprets relevance. G.S. 8C-1, Rule 401 makes relevant "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Just as evidence of physical injury has been admissible as relevant to the issue of rape, so should evidence of emotional injury to the victim be relevant to show that it is more likely that a rape occurred. Neither should the expert testimony be excluded on the grounds of unfair prejudice. In my view, the admission of expert testimony as to the

symptoms or existence of rape trauma syndrome is no more inflammatory, prejudicial or invasive of the province of the jury as the judges of credibility and fact than any other expert testimony.

I would hold that there was no error in the admission of Dr. Ponzi's testimony.