STATE OF NORTH CAROLINA v. DONNIE RAY HALL

No. 201PA90

(Filed 31 January 1992)

**1. Evidence and Witnesses § 2332 (NCI4th) — child rape victim — symptoms of abused children**

     Although expert testimony on the symptoms and characteristics of sexually abused children has been held admissible to assist the jury in understanding the behavior patterns of sexually abused children, and evidence that a par-

STATE v. HALL

[330 N.C. 808 (1992)]

ticular child's symptoms were consistent with those of sexual or physical abuse victims was admissible to aid the jury in assessing the complainant's credibility, the trial court here did not limit the permissible uses of the profile evidence and the witness was never explicitly or implicitly qualified as an expert witness by the trial court.

**Am Jur 2d, Infants §§ 16, 17.5; Rape § 68.**

2. **Evidence and Witnesses § 2342 (NCI4th) — child rape victim — post-traumatic stress syndrome — admissible for corroborative purposes**

Evidence that a prosecuting witness is suffering from post-traumatic stress syndrome should not be admitted for the substantive purpose of proving that a rape has in fact occurred; however, such evidence may be admitted for certain corroborative purposes. The trial court should balance the probative value of evidence of post-traumatic stress, or rape trauma, syndrome against its prejudicial impact under N.C.G.S. § 8C-1, Rule 403 and should also determine whether the admission of this evidence would be helpful to the trier of fact under N.C.G.S. § 8C-1, Rule 702. If admitted, the trial court should take pains to explain to the jurors the limited uses for which the evidence is admitted and the evidence may not be admitted in any case for the sole purpose of proving that a rape or sexual abuse has occurred.

**Am Jur 2d, Expert and Opinion Evidence § 197; Infants §§ 16, 17.5; Rape §§ 68, 68.5.**

**Admissibility, at criminal prosecution, of expert testimony on rape trauma syndrome. 42 ALR4th 879.**

3. **Evidence and Witnesses § 2342 (NCI4th) — child rape victim — conversion reaction — admissible for corroborative purposes**

Evidence that a prosecuting witness has suffered a conversion reaction may be admitted for corroborative purposes to the same extent as evidence that she has suffered from post-traumatic stress syndrome.

**Am Jur 2d, Expert and Opinion Evidence § 197; Infants §§ 16, 17.5; Rape § 68.**

STATE v. HALL

[330 N.C. 808 (1992)]

4. **Evidence and Witnesses § 2342 (NCI4th) — child rape victim — post-traumatic stress syndrome — conversion reaction — erroneously admitted**

The trial court erroneously admitted evidence that a 15 year old rape victim was suffering from post-traumatic stress syndrome and conversion reaction where the testimony was admitted for the substantive purpose of allowing the jury to infer that the victim had in fact been raped and was not limited by the court to corroborating the victim's version of events.

**Am Jur 2d, Expert and Opinion Evidence § 197; Infants §§ 16, 17.5; Rape §§ 68, 68.5.**

**Admissibility, at criminal prosecution, of expert testimony on rape trauma syndrome. 42 ALR4th 879.**

5. **Evidence and Witnesses § 737 (NCI4th) — child rape victim — expert testimony admitted — abused child profile, conversion reaction, and post-traumatic stress syndrome — reversible error**

There was reversible error requiring a new trial in the prosecution of defendant for the rape of his 15 year old step-daughter where the court admitted evidence of an abused child profile, post-traumatic stress syndrome, and conversion reaction without limiting instructions and the remaining evidence of sexual abuse was in sharp conflict. In light of that conflict, defendant did show under N.C.G.S. § 15A-1443(a) that there was a reasonable possibility that he would have been acquitted had evidence of the disorders not been erroneously admitted.

**Am Jur 2d, Expert and Opinion Evidence § 197; Infants §§ 16, 17.5; Rape §§ 68, 68.5.**

**Admissibility, at criminal prosecution, of expert testimony on rape trauma syndrome. 42 ALR4th 879.**

6. **Evidence and Witnesses § 2854 (NCI4th) — detective's notes — in camera examination — not used when testifying — privileged information — not disclosed**

The trial court did not err in a prosecution of defendant for the rape of his stepdaughter by not permitting defense counsel to examine certain notes in a detective's file where the court reviewed the notes *in camera* and found that the

**STATE v. HALL**

[330 N.C. 808 (1992)]

notes contained privileged information which the interests of justice did not require to be disclosed and that the detective had not used that information to refresh his memory before testifying. The trial court employed the proper procedures pursuant to N.C.G.S. § 8C-1, Rule 612.

**Am Jur 2d, Depositions and Discovery § 425; Witnesses §§ 459-461.**

Justice WHICHARD dissenting.

Justices MITCHELL and WEBB join in this dissenting opinion.

ON discretionary review of a unanimous decision by the Court of Appeals, 98 N.C. App. 1, 390 S.E.2d 169 (1990), finding no error in the verdict and judgment rendered at the 17 January 1989 Criminal Session of Superior Court, SURRY County, *Morgan, J.,* presiding. Heard in the Supreme Court 14 March 1991.

*Lacy H. Thornburg, Attorney General, by Ellen B. Scouten and John F. Maddrey, Assistant Attorneys General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Mark D. Montgomery, Assistant Appellate Defender, for defendant-appellant.*

EXUM, Chief Justice.

This appeal arises from defendant's convictions for second-degree rape in violation of N.C.G.S. § 14-27.3 and sexual activity by a substitute parent in violation of N.C.G.S. § 14-27.7. The trial court admitted evidence that the prosecuting witness suffered a conversion reaction and post-traumatic stress disorder following an alleged rape by her stepfather. We conclude that the admission of evidence on these two psychological phenomena constitutes error where offered for the substantive purpose of proving that the rape did in fact occur. Accordingly, we reverse the decision of the Court of Appeals and remand for a new trial.

I.

The events at issue took place on 13 February 1988. At about 2 a.m., defendant Donnie Ray Hall and the prosecuting witness [whom we shall refer to as M.M. because of her young age], defendant's fifteen-year-old stepdaughter, returned to their home after visiting a family friend. The rest of the family, including defendant's

wife (and M.M.'s mother), were already asleep. M.M. testified that, after making defendant a sandwich, she proceeded to her bedroom which she shared with her eight-year-old stepsister. After M.M. was in the bedroom and dressed for bed, defendant came into the room supposedly to check on a wood stove.

M.M. testified that defendant started kissing her, although she told defendant to stop. Defendant fondled M.M.'s breasts and between her legs, eventually penetrating her vagina with his penis. He told her not to tell anyone, and threatened to harm her family members if she did. She did not scream or call for help, although her sister was in the bedroom with her, and her mother was in the next room. M.M. claimed she was too frightened. Within a few days, M.M. told a friend, her mother, and the authorities about these events.

Several weeks later, M.M. suffered some degree of paralysis, which could not be attributed to any physiological causes. Her doctors decided that M.M.'s condition was due to psychosomatic causes. She was hospitalized for several months beginning on 27 March 1988. Several weeks after her discharge, she was readmitted after attempting suicide.

M.M. also testified about several instances in 1985 when defendant had inserted his fingers between her legs. These events resulted in defendant pleading guilty to taking indecent liberties with a minor. He was subsequently incarcerated.

Several health care professionals testified about symptoms M.M. displayed after the alleged rape. The crux of this collective testimony, which is discussed in more detail below, was: that M.M. fit the "profile" of sexually abused children; that she suffered a neurologically inexplicable paralysis known as "conversion reaction," which is caused by severe psychological trauma, anxiety or depression; and that she was suffering from post-traumatic stress disorder, which involves psychological responses to certain emotionally traumatic events.

At the close of the State's evidence, the trial court denied defendant's motion to dismiss. Defendant then proceeded to put on evidence of his own.

Patricia Hall, who is defendant's wife and M.M.'s mother, testified on her husband's behalf. She stated that, although her bedroom was next to M.M.'s, she heard no sounds from it on the

night in question. Deborah Graybill, a family friend, testified that, during the time defendant was incarcerated for his 1985 indecent liberties conviction, M.M. told Graybill that she would send defendant back to prison one way or another. Carleen Boulden, a neighbor, testified that M.M. telephoned a social worker from the Boulden home in 1987. M.M. told the social worker that defendant hit her. After this conversation, M.M. told Boulden that she would do anything to put defendant back in prison, and that she didn't care what it took. Furthermore, a doctor who examined M.M. a few days after the alleged assault testified that his examination revealed no evidence of physical trauma. M.M. did, however, complain to him that she had some tenderness in the back part of her vagina.

Taking the stand in his own defense, defendant admitted pleading guilty in 1985 to taking indecent liberties with M.M. He stated further that he was in fact guilty of this earlier crime. However, defendant denied ever having sex with M.M. or doing anything with her, or to her, on the night in question. He denied both entering the room and touching her.

The trial court submitted verdict sheets to the jury, which found defendant guilty of second-degree rape and of sexual activity by a substitute parent. The trial court sentenced defendant to thirty years' imprisonment for rape and to a consecutive six-year term for the sexual activity charge.

Defendant appealed to the North Carolina Court of Appeals, which unanimously affirmed the trial court's decision. Subsequently, we allowed defendant's petition for discretionary review. We now reverse the Court of Appeals and order a new trial.

## II.

We consider the admissibility of expert testimony that M.M. suffered a conversion reaction and post-traumatic stress disorder after the alleged rape. We conclude that this evidence, although admissible for corroborative purposes, was not admissible to show that a rape had in fact occurred. We therefore reverse the decision of the Court of Appeals.

## A.

The testimony at issue today was offered by the State and came from three sources: Judy Stadler, a clinical social worker with a Bachelor of Arts degree in psychology and a Masters in

counseling; Dr. Sarah Sinal, a pediatrician at Baptist Hospital and the Bowman-Gray School of Medicine; and Dr. Roy Haberkern, a child psychiatrist and the head of Child Psychiatry at Baptist Hospital and the Bowman-Gray School of Medicine. The State presented no physical evidence nor any other medical evidence that a rape had in fact occurred. It relied heavily on the testimony of the prosecuting witness and the three experts to make its case against defendant.

Stadler, who was not tendered by the State as an expert witness, testified that she had counseled M.M. on separate occasions in 1985 and 1988. On both occasions, M.M. had been referred to Stadler due to allegations by the child of sexual abuse. Stadler testified that in both 1985 and 1988 M.M. fit a profile of characteristics of children who had been sexually abused. The following exchange between Stadler and the prosecuting attorney took place:

Q. . . . Now, on the first visit that you saw her [M.M.] back in 1985 would you state whether or not [M.M.] exhibited any characteristics of a child that had been sexually abused.

MR. WHITE: Objection.

THE COURT: Overruled.

Q. You may answer.

A. There are profile, there is a profile of characteristics that you can look at that has been stated that where other children who have been abused appear. And yes, [M.M.] did fit that profile.

Q. Now, on the second time that you saw her in March of 1988, would you state whether or not [M.M.] exhibited any of those characteristics of a sexually abused child.

MR. WHITE: Objection.

THE COURT: Overruled.

A. Again, she did fit this profile. And at that point of time she was quite a great deal more serious in those characteristics.

On cross-examination, Stadler further testified in explaining an answer that

[M.M.] fit the profile of a sexually abused child. And one of the characteristics of that is that a sexually abused victim

feels very helpless, powerless. And often they're unable to fight back. They have very low self-esteem and low confidence.

On redirect examination by the State, Stadler stated that M.M. did in fact exhibit the characteristic of helplessness often associated with the profile of a sexually abused child.

Dr. Sinal was qualified as an expert in pediatrics. She testified that she treated [M.M.] at Baptist Hospital in Winston-Salem in April 1988. Dr. Sinal stated that M.M. was admitted to the hospital because she had been "functioning as if she was paralyzed from the neck down." When tests for physical or neurological damage turned out negative, Dr. Sinal made a diagnosis of a "conversion reaction." She described a conversion reaction in the following manner:

A conversion reaction is where a person has a paralysis, for example, is unable to move an arm or a leg, but there is not anything wrong with muscles or nerves. There is no neurological condition to explain that. And the way I understand it is that it's the result, usually, of very severe anxiety and sometimes depression.

Over repeated objections by counsel for the defendant, Dr. Sinal stated her opinion that M.M. had a conversion reaction resulting from sexual abuse. Furthermore, she opined that M.M. displayed other characteristics of sexual abuse, including suicidal tendencies, depression, anxiety, frustration at her inability to control events around her and an increasing feeling of being victimized. Dr. Sinal also testified "that in many incidents a feeling of powerlessness, unable to control the environment around you is a sign, a symptom of sexual abuse."

Dr. Haberkern was qualified as an expert in the area of child psychiatry. He testified that M.M. was admitted to his service on 4 April 1988. He was M.M.'s attending physician until her discharge on 12 May 1988 and continued treating her on an outpatient basis thereafter. Dr. Haberkern diagnosed M.M. as suffering from post-traumatic stress syndrome and conversion disorder. He described conversion disorder, or conversion reaction, as "an impairment of function that has the appearance of being physical in nature. It begins generally in the context of a significant psychological stress. . . ." In Dr. Haberkern's opinion, M.M.'s conversion reaction was consistent with characteristics of sexual abuse.

He stated that he knew of no other significant event in her life that could have led to such a reaction.

Dr. Haberkern also diagnosed M.M. for post-traumatic stress syndrome. He described this condition as follows:

> It is a response of an individual to what would be an emotionally traumatic event for anyone: Landslide, earthquake, fire, being told your mother has cancer, being raped, that in which the behavior pattern seems to consist of being flooded by memories associated with tremendous anxiety of the traumatic event alternating with what's termed psychic numbing, where one kind of shuts out one's receptiveness to everyday events. Also associated with a state of hyper-vigilance, hyper-awareness, alarm, feeling endangered.

He stated that this condition can last from several months to years. Dr. Haberkern further testified that feelings of powerlessness or helplessness, being unable to "fight back" or resist, and suicidal tendencies are also characteristic of sexual abuse.

Defendant repeatedly objected to the testimony of these three witnesses as it related to M.M.'s psychological status. The trial court overruled the objections and admitted the evidence. It did not, however, limit the permissible uses of such evidence.

### B.

[1]  We first consider Stadler's testimony and do so separately from the testimony of Sinal and Haberkern because we believe the subject matter of her statements to be of a different nature than those of the two, qualified experts. As such, it may well be outside the parameters of our order allowing discretionary review. As we understand the petition for discretionary review, defendant was to argue that the statements of the three witnesses regarding conversion disorders and post-traumatic stress syndrome are inadmissible. However, our review of the trial transcript shows that Stadler never discussed conversion disorders or post-traumatic stress syndrome during her testimony, as did Drs. Sinal and Haberkern. Stadler's testimony was limited to a discussion of the typical symptoms and characteristics of sexually abused children. She further stated that M.M.'s symptoms appeared to fit that "profile" of a sexually abused child. Because we are ultimately remanding this case for retrial, we have decided to discuss some difficulties we perceive to be present in the transcript.

This Court has already considered the admissibility of so-called "profile" evidence in *State v. Kennedy,* 320 N.C. 20, 357 S.E.2d 359 (1987). In *Kennedy,* we stated that expert testimony on the symptoms and characteristics of sexually abused children is admissible to assist the jury in understanding the behavior patterns of sexually abused children. *Id.* at 32, 357 S.E.2d at 366. Furthermore, we allowed evidence that a particular child's symptoms were consistent with those of sexual or physical abuse victims, but only to aid the jury in assessing the complainant's credibility. *Id.* We note at the outset that the trial court here did not limit the permissible uses of the "profile" evidence as presented by Stadler.

Additionally, we are concerned that Stadler was never explicitly or implicitly qualified as an expert witness by the trial court. The Court of Appeals held that the trial court exercised its sound discretion in qualifying Stadler as an expert pursuant to *State v. Howard,* 78 N.C. App. 262, 270, 337 S.E.2d 598, 603 (1985), *disc. rev. denied,* 316 N.C. 198, 341 S.E.2d 581 (1986). We disagree. Although Stadler was not explicitly qualified by the trial court, her testimony was nevertheless permissible if she had been *implicitly* qualified as an expert on the profiles of sexually abused children. *State v. Aguallo,* 322 N.C. 818, 370 S.E.2d 676 (1988). In *Aguallo,* this Court found that similar testimony from a child protective services case worker and from a juvenile investigator was admissible where "the nature of their jobs and the experience which they possessed made them better qualified than the jury to form an opinion as to the characteristics of abused children." *Id.* at 821, 370 S.E.2d at 677. The *Aguallo* testimony was admitted over the general objections of the defendant where the defendant failed to specially request that the trial court make a finding as to the expert qualifications of the two witnesses. Absent such a request, we held that the trial court's admission of their testimony over defendant's general objections was an implicit holding that the witnesses were qualified to testify as experts. *Id.; see also State v. Phifer,* 290 N.C. 203, 225 S.E.2d 786 (1976), *cert. denied sub nom., Lawrence v. North Carolina,* 429 U.S. 1050, 50 L. Ed. 2d 766 (1977), *and cert. denied, Phifer v. North Carolina,* 429 U.S. 1123, 51 L. Ed. 2d 573 (1977). However, in the present case the record affirmatively reveals that Stadler was never *tendered* by the State as an expert witness. The transcript indicates that the prosecution purposefully did not tender Stadler as an expert

STATE v. HALL

[330 N.C. 808 (1992)]

witness.[1] Only an expert in the field may testify on the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent with this profile.[2] *State v. Kennedy*, 320 N.C. 20, 357 S.E.2d 359 (1987); *State v. Aguallo*, 322 N.C. 818, 370 S.E.2d 676 (1988).

## C.

[2] The question of the admissibility of evidence that a prosecuting witness is suffering from post-traumatic stress syndrome has also been previously presented to our appellate courts. However, this Court has not finally resolved the extent of its permissible uses. The question first arose in *State v. Stafford*, 77 N.C. App. 19, 334 S.E.2d 799 (1985), *aff'd*, 317 N.C. 568, 346 S.E.2d 463 (1986). In an opinion written by Judge (now Justice) Webb, a majority panel of the Court of Appeals found that evidence regarding rape trauma syndrome[3] was inadmissible hearsay not within a hearsay

---

1. At page 223 of the transcript, the prosecutor made the following statement to the trial judge during the direct examination of Stadler:

> I have not tendered her as an expert. I've not been allowed. I asked expert questions. Each time the Court sustained her opinion as to those characteristics and progression of those characteristics, how long they would last. I'm not asking her as an expert. I'm asking her as a counselor at Crossroads, Surry Friends of Youth, about this, which is [an] entirely different matter from the expert. We don't intend to ask the doctors that.

The affirmative statements by the prosecutor that he did not tender this witness as an expert witness distinguish the present case from *Aguallo*.

2. We express no opinion as to whether Stadler could or could not qualify as an expert in this field. As the Court of Appeals correctly pointed out, pursuant to *State v. Howard*, 78 N.C. App. 262, 270, 337 S.E.2d 598, 603 (1985), *disc. rev. denied*, 316 N.C. 198, 341 S.E.2d 581 (1986), this is a decision within the sound discretion of the trial court.

3. Although M.M. was not diagnosed as having "rape trauma syndrome," we consider it today for evidentiary purposes in the same light as post-traumatic stress syndrome. Rape trauma syndrome is apparently but one of several different variations of post-traumatic stress syndrome. The cases and commentaries that discuss rape trauma disorders highlight particular characteristics, such as fear of men, which do not necessarily occur in the more generic post-traumatic stress syndrome. *See People v. Taylor*, 75 N.Y.2d 277, 287, 552 N.E.2d 131, 135, 552 N.Y.S.2d 883, 891 (1990); *see generally*, Toni M. Massaro, *Experts, Psychology, Credibility, and Rape: The Rape Trauma Syndrome Issue and Its Implications for Expert Psychological Testimony*, 69 Minn. L. Rev. 395 (1985). Nevertheless, the symptoms and characteristics particular to post-traumatic stress disorder are also generally found in victims of rape trauma syndrome and other particularized variations of this disorder. *Id.*

STATE v. HALL

[330 N.C. 808 (1992)]

exception. In *Stafford* the prosecuting witness communicated with a physician about her symptoms, not for the purpose of medical diagnosis or treatment, but rather in preparation for trial. *Stafford*, 317 N.C. at 568-69, 346 S.E.2d at 464. We affirmed the Court of Appeals decision holding that the evidence was inadmissible hearsay, specifically leaving open the question of the admissibility of rape trauma syndrome evidence. *Id.* at 575-76, 346 S.E.2d at 468.

The question of the admissibility of evidence that a prosecuting witness in a sex offense trial suffered post-traumatic stress syndrome was again presented to this Court in *State v. Godwin*, 320 N.C. 147, 357 S.E.2d 639 (1987). In *Godwin* we concluded that the State failed to lay a sufficient foundation to qualify its witness as an expert in what was, at the time, a newly emerging field. *Id.* at 151, 357 S.E.2d at 641. We held that the relatively recent recognition of the disorder, coupled with the lack of evidence that the witness had the proper education and experience to testify on that subject, precluded the witness's qualification as an expert witness. *Id.* Once again, we left open the issue presented to us today.

The Court of Appeals has since found this type of expert testimony on post-traumatic stress syndrome to be admissible, both in the case at bar, 98 N.C. App. 1, 390 S.E.2d 169, and in *State v. Strickland*, 96 N.C. App. 642, 387 S.E.2d 62, *disc. rev. denied*, 326 N.C. 486, 392 S.E.2d 100 (1990). Today, we specifically address the admissibility of evidence that the complainant suffered from post-traumatic stress syndrome, as well as evidence that she suffered a conversion disorder.

Courts in other jurisdictions have encountered difficulty in admitting evidence that a complainant suffers from these psychological disorders, but for reasons other than the relatively recent recognition of the disorders. *See People v. Taylor*, 75 N.Y.2d 277, 289-92, 552 N.E.2d 131, 136-38, 552 N.Y.S.2d 883, 888-90 (1990). Both disorders were identified by the American Psychiatric Association in their most recent edition of the Diagnostic and Statistical Manual of Mental Disorders (3d ed. rev. 1987) ("DSM III-R"). *See* DSM III-R at 247 ("Post-traumatic Stress Disorder"); DSM III-R at 257 ("Conversion Disorder"). As such, we believe that these disorders have gained sufficient recognition in the medical, and particularly the psychiatric, community to be considered as the proper subject of expert testimony.

STATE v. HALL

[330 N.C. 808 (1992)]

Nevertheless, we remain concerned about the unlimited use of evidence that a prosecuting witness suffers from either disorder, especially where, as here, the expert testimony is admitted as substantive evidence that a rape has in fact occurred. There are two, primary problems when such evidence is employed to show that a rape has occurred. First, the psychiatric procedures used in developing the diagnosis are designed for therapeutic purposes and are not reliable as fact-finding tools to determine whether a rape has in fact occurred. Second, the potential for prejudice looms large because the jury may accord too much weight to expert opinions stating medical conclusions which were drawn from diagnostic methods having limited merit as fact-finding devices. In excluding rape trauma syndrome evidence, the California Supreme Court has stated that:

> [A]s a rule, rape counselors do not probe inconsistencies in their clients' descriptions of the facts of the incident, nor do they conduct independent investigations to determine whether other evidence corroborates or contradicts their clients' renditions. Because their function is to help their clients deal with the trauma they are experiencing, the historical accuracy of the clients' descriptions of the details of the traumatizing events is not vital in their task. To our knowledge, all of the studies that have been conducted in this field to date have analyzed data that have been gathered through this counseling process and, as far as we are aware, none of the studies has attempted independently to verify the "truth" of the clients' recollections or to determine the legal implication of the clients' factual accounts.

*People v. Bledsoe*, 36 Cal. 3d 236, 250, 681 P.2d 291, 300, 203 Cal. Rptr. 450, 459 (1984). The *Bledsoe* court also expressed its concern that rape trauma syndrome "does not consist of a relatively narrow set of criteria or symptoms whose presence demonstrates that the client or patient has been raped; rather, . . . it is an 'umbrella' concept, reflecting the broad range of emotional trauma experienced by clients of rape counselors." *Id.* at 250, 681 P.2d at 301, 203 Cal. Rptr. at 460. It is this lack of critical inquiry into the factual accuracy of complainant's story that renders this evidence's probative value slight, and its helpfulness to the jury minimal. Thus, the demand of Evidence Rule 702 that the special knowledge of the expert "assist the trier of fact to understand the evidence or to determine a fact in issue" is hardly met.

STATE v. HALL

[330 N.C. 808 (1992)]

Furthermore, when it comes to the more general post-traumatic stress syndrome, rape is but one of several, possible causes of the disorder. DSM III-R at 247-48. As Dr. Haberkern pointed out in his testimony, there are a number of traumatic stimuli that potentially could trigger the syndrome. In those cases where post-traumatic stress syndrome evidence is admitted to prove sexual abuse has in fact occurred, we believe the potential for prejudice against the defendant looms large because of that aura of special reliability and trustworthiness often surrounding scientific or medical evidence. Thus, on balance, evidence that a prosecuting witness is suffering from post-traumatic stress syndrome should not be admitted for the substantive purpose of proving that a rape has in fact occurred.

Nonetheless, we will not exclude such evidence for all purposes and hold that it may be admitted for certain corroborative purposes. Although we find that evidence of post-traumatic stress syndrome does not alone prove that sexual abuse has in fact occurred, we believe that this should not preclude its admission at trial where the relevance to certain disputed issues has been shown by the prosecution.

We find support for our decision in *People v. Taylor*, 75 N.Y.2d 277, 552 N.E.2d 131, 552 N.Y.S.2d 883 (1990). In *Taylor*, the New York Court of Appeals found evidence of rape trauma syndrome to be admissible for the limited purpose of explaining why a rape victim may have been initially unwilling to report that the defendant was the person who attacked her. In a companion case, however, the *Taylor* court refused to permit the admission of such evidence for the sole purpose of proving that a rape had in fact occurred. *Id.* at 293, 552 N.E.2d at 138-39, 552 N.Y.S.2d at 890. Upon an exhaustive, insightful review of the myriad approaches which jurisdictions across the country have taken to the admission of post-traumatic stress disorder and rape trauma syndrome, the *Taylor* court concluded that such evidence could indeed aid the jury in reaching a verdict "by disspelling common misperceptions" about rape and sexual abuse. *Id.* at 292, 552 N.E.2d at 138, 552 N.Y.S.2d at 890. "[T]he reason why the testimony is offered will determine its helpfulness, its relevance and its potential for prejudice." *Id.*

We adopt similar reasoning in holding that the purposes for which such evidence is offered will ultimately determine the admissibility of evidence that the prosecuting witness suffers from

post-traumatic stress disorder or rape trauma syndrome. When the complainant testifies at trial that she has been sexually assaulted, the jury is given the unique and exclusive opportunity to access the credibility of her story, both on direct and cross examination. This is accomplished in a manner which is not usually available to the treating physician who generally assumes the veracity of the patient's account in formulating a diagnosis and treatment. The jury is also able to evaluate her story in light of other evidence adduced at trial. These factors ameliorate the lack of critical inquiry by therapists and may put the jury in an improved position to determine the complainant's credibility. However, jurors may not completely understand certain post-assault behavior patterns of a sexual assault victim and, as pointed out in *Taylor*, may entertain other misconceptions about the often bewildering nature of the crime of rape. Testimony that the complainant suffers from post-traumatic stress disorder may therefore cast light onto the victim's version of events and other, critical issues at trial. For example, testimony on post-traumatic stress syndrome may assist in corroborating the victim's story, or it may help to explain delays in reporting the crime or to refute the defense of consent.

This list of permissible uses is by no means exhaustive. The trial court should balance the probative value of evidence of post-traumatic stress, or rape trauma, syndrome against its prejudicial impact under Evidence Rule 403. It should also determine whether admission of this evidence would be helpful to the trier of fact under Evidence Rule 702. If the trial court is satisfied that these criteria have been met on the facts of the particular case, then the evidence may be admitted for the purposes of corroboration. If admitted, the trial judge should take pains to explain to the jurors the limited uses for which the evidence is admitted. In no case may the evidence be admitted substantively for the sole purpose of proving that a rape or sexual abuse has in fact occurred.

[3] Although conversion disorders are characterized by different symptoms, diagnoses and methodologies than is post-traumatic stress syndrome or rape trauma syndrome, DSM III-R at 257-59, we believe the same evidentiary approach should apply to each of these types of disorders. Like post-traumatic stress syndrome, conversion disorders are caused by severe psychological trauma. Also, as with the "syndrome" disorders, treatment is largely based on the assumption that the alleged victim's explanation of the causes of her problems is true. Thus, evidence a complainant is suffering

STATE v. HALL

[330 N.C. 808 (1992)]

a conversion disorder, allegedly caused by sexual abuse, is fraught with the same reliability problems as similar testimony on post-traumatic stress syndrome. Likewise, the same threat of prejudice arises with expert testimony of either disorder due to that special reliability jurors often attach to scientific or medical evidence.

Therefore, evidence that a prosecuting witness has suffered a conversion reaction may be admitted for corroborative purposes to the same extent as evidence that she has suffered from post-traumatic stress syndrome. In both situations, the jury's opportunity to observe the witness under direct and cross examination, and to evaluate her story in light of other evidence, may make admission of such evidence more probative than prejudicial on the question of the prosecuting witness's credibility. Expert testimony of this type could also be helpful to the jury in understanding the nature and causes of these disorders, as well as the post-assault behavior patterns of the complainant.

D.

[4]  Pursuant to the rule we have enunciated today, we find error in the admission of the expert testimony by Drs. Sinal and Haberkern. Dr. Sinal's testimony relating to M.M.'s treatment and condition largely addressed her conversion reaction to the alleged sexual abuse by her stepfather. Similarly, Dr. Haberkern's testimony indicated that M.M. suffered a conversion disorder, as evidenced by her paralysis, and from post-traumatic stress syndrome. The testimony of both witnesses, taken over defendant's repeated objections, was not limited by the trial court to any particular purpose. It was admitted for the substantive purpose of allowing the jury to infer that M.M. had in fact been raped. Because this evidence was not limited by the trial court to corroborating M.M.'s version of the events that transpired on 13 February 1988, we find error in its admission.

III.

[5]  Finally, we must assess whether the admission of the proffered evidence of Drs. Sinal and Haberkern, as well as that of Judy Stadler, constituted reversible error requiring a new trial. We conclude that it did. The remaining evidence of the alleged sexual abuse was in sharp conflict. The State portrayed defendant as taking sexual gratification by raping M.M., perhaps as part of an ongoing scheme or plan that had previously included taking inde-

cent liberties with the child. This portrayal was based exclusively on the testimony of M.M. There was no physical evidence of rape or sexual abuse. Meanwhile, defendant's evidence portrayed M.M. as vindictively attempting to have defendant reincarcerated. There were several witnesses who testified that M.M. was dishonest to the point that she would lie on the stand about the rape, in order to have her stepfather put back in jail. Even M.M.'s mother testified on behalf of defendant that she was in the next room and heard nothing on the night in question. In light of this conflict, defendant has shown under N.C.G.S. § 15A-1443(a) that there is a reasonable possibility he would have been acquitted of the charges had evidence of the disorders not been erroneously admitted against him.

## IV.

[6] Defendant's second assignment of error deals with certain documents contained in a file used by Detective Gray Shelton of the Mount Airy Police Department during his testimony for the State. Detective Shelton was the investigating officer on this case. At trial, following Detective Shelton's direct examination, defense counsel requested that counsel be allowed to examine Detective Shelton's file. The State objected to the disclosure of certain notes contained in the file which, it argued, were not discoverable. The trial judge excused the jurors, and proceeded to an *in camera* review of the notes in question. The trial judge found that, pursuant to Rule 612 of the North Carolina Rules of Evidence, these notes contained privileged information about the prosecuting witness which it would not be in the interests of justice to disclose. He further found that Detective Shelton had not used this information to refresh his memory before testifying. The trial judge then ordered the documents in question sealed for appellate review.

This Court has previously held that it is not error for the trial court to refuse to afford defendant access to notes carried to the witness stand by an investigating officer who does not refer to them during his testimony. *State v. Jackson*, 302 N.C. 101, 106-07, 273 S.E.2d 666, 671 (1981). The trial court employed the proper procedures pursuant to the dictates of Evidence Rule 612. Defendant's argument is, therefore, rejected.

## V.

Based on defendant's first assignment of error, we reverse the decision of the Court of Appeals and remand to that court,

STATE v. HALL

[330 N.C. 808 (1992)]

with further instructions that it remand the case to the Superior Court, Surry County, for a new trial consistent with this opinion. Defendant's second assignment of error is overruled.

Reversed and remanded.

Justice WHICHARD dissenting.

I agree with the Court of Appeals that the evidence in question was a proper subject for expert testimony. *See State v. Hall*, 98 N.C. App. 1, 7-8, 390 S.E.2d 169, 172-73 (1990). Most jurisdictions apparently allow such evidence. *See State v. Strickland*, 96 N.C. App. 642, 646-47, 387 S.E.2d 62, 65 (1990). It clearly has some "tendency to make the existence of [a] fact that is of consequence to the determination of the action [*i.e.*, the alleged rape] more probable . . . than it would be without the evidence," and it thus meets the statutory test for relevancy. N.C.G.S. § 8C-1, Rule 401 (1988). The concerns presented in the majority opinion are properly addressed by cross-examination, introduction of rebuttal evidence (expert or otherwise), and jury argument, not by exclusion of the testimony as substantive evidence. The concerns properly relate to the weight or credibility of the evidence, not its admissibility.

I share the following view expressed by Judge John C. Martin in a dissenting opinion for the Court of Appeals:

I would hold such expert testimony admissible. There is recognized scientific authority for the medical conclusion that there exists a complex and unique number of physical and emotional symptoms exhibited by victims of rape, which are similar, but not identical, to other post-traumatic stress disorder symptoms. . . . An understanding of those symptoms, the unique reactions of victims of rape, is not within the common knowledge or experience of most persons called upon to serve as jurors. Therefore, expert testimony as to the symptoms of the syndrome and its existence, is admissible to assist the jurors in understanding the evidence and in drawing appropriate conclusions therefrom. . . .

To say that such evidence is irrelevant misinterprets relevance. G.S. 8C-1, Rule 401 makes relevant "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Just

as evidence of physical injury has been admissible as relevant to the issue of rape, so should evidence of emotional injury to the victim be relevant to show that it is more likely that a rape occurred. Neither should the expert testimony be excluded on the grounds of unfair prejudice. . . . [T]he admission of expert testimony as to the symptoms or existence of rape trauma syndrome is no more inflammatory, prejudicial or invasive of the province of the jury as the judges of credibility and fact than any other expert testimony.

*State v. Stafford,* 77 N.C. App. 19, 26-27, 334 S.E.2d 799, 803-04 (1985) (Martin, J., dissenting) (citations omitted), *aff'd,* 317 N.C. 568, 346 S.E.2d 463 (1986).

I therefore respectfully dissent.

Justices MITCHELL and WEBB join in this dissenting opinion.